UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| GUADALUPE "LUPE" BARELAS § | |
| § | |
| **Plaintiff,** § | |
| § | |
| VS. § | |
| § | |
| DOLLAR GENERAL § Case No. 4:22-cv-686 |
| CORPORATION, § | |
| § | |
| **Defendant** § | |

**PLAINTIFF GUADALUPE BARELAS' ORIGINAL COMPLAINT**

Plaintiff Guadalupe Barelas, by her counsel, files this her Original Complaint against Defendant Dollar General Corporation (DGC), alleging as follows:

**I.     JURISDICTION AND VENUE**

1. This action arises under the Fair Labor Standards Act (FLSA), the Family and Medical Leave Act (FMLA), Americans with Disabilities Act (ADA), and Title VII. Accordingly, this Court has federal question jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1221 and 28 U.S.C. §§ 1338(a) (b).

2. This Court has personal jurisdiction over Defendant DGC as it does business within the Eastern District of Texas, being generally present for jurisdictional purposes by operating scores of stores within this division, hundreds of stores within this District, and over 1,500 retail stores throughout Texas.

3. Venue is appropriate in the Eastern District of Texas and this matter is properly in the Sherman Division, pursuant to 28 U.S.C. Section 1931(b)(2), because the majority of the acts or omissions that form the basis of this action occurred within the Sherman Division of the Eastern District of Texas.

**PLAINTIFF GUADALUPE BARELAS' ORIGINAL COMPLAINT - PAGE 1**

## II. PARTIES

4. Plaintiff **Guadalupe "Lupe" Barelas** ("Barelas") is a Texas citizen residing in Prosper, Texas.

5. Defendant **Dollar General Corporation** ("DGC" or "Dollar general") is incorporated under the Laws of Tennessee, with its headquarters and nerve center in Goodletsville, Tennessee.  Defendant DGC may be served through its registered agent for service of process:

> Dolgencorp of Texas, Inc.
> d/b/a Dollar General
> c/o Corporation Service Company
> 211 E. 7th Street, Suite 620
> Austin, TX 78701-3218, USA

## III. THE FACTUAL BACKGROUND OF THE ACTION

6. Barelas began working at DGC on December 7, 2019. She was initially assigned to train with Jeffery Bottorff, the District Manager for District 107. Barelas received training at Corporate Office outside of Nashville between January 6th and 17th of 2020. During her training she rated as a top performer out of the class.

7. Barelas' initial work assignments were temporary in nature. However, she worked hard and received accolades for her performance. From January 26 to February 7, 2020, she covered District 480 for Region 64 under Regional Director Julie Joseph, while Barelas' newly assigned District Manager completed his own training. While in Region 64, Barelas was complimented on her performance by both Regional Directors and the Divisional Team, and Regional Director Julie Joseph commented that she would be excited to have Barelas on her team.

8. From February 20 to March 3, 2020, Barelas covered District 65 while its District Manager was on vacation. Barelas' work was again well received, and she was complimented on her performance from the Regional Director and Divisional Vice President. From March 9 until

**PLAINTIFF GUADALUPE BARELAS' ORIGINAL COMPLAINT - PAGE 2**

15, Barelas covered District 64 while its District Manager was on vacation. Again, her work was well received, and she was complimented on her performance by the Regional Director and Divisional Vice President.

9. Barelas finally received her permanent assignment as District 64 manager on March 21, 2020. She immediately took ownership of her district and started producing excellent results:

**District 64 Performance Matrix for Core Profitability and Business Performance**

- **DIVISION RANKINGS INCREASE DRAMATICALLY:** During her tenure at the helm of her district, it moved up from last place to 9 of 12 in the region.

- **SALES GOAL SURPASSED AND GROWING*:* Barelas grew her district sales from 11.9% to 17.7%, surpassing the 5% Comp goal Threshold and 7.5% Maximum to Plan from 105.59% when she took over the district to 114.12% at the time of her termination.

- **BEATS OSA OUTS GOAL OF 250:** Prior to being assigned to Barelas the district was at 330, but during her tenure, Barelas moved that number to 247, Even more, this number continued to be significantly improved in December, prior to her termination date, but reporting to reflect it was not released until mid-January when she did not have access to the number.

- **HBC OUTS:** Reduced from **138** to **108.**

- **IMPROVES DGC CUSTOMER 1ST:** With a company Goal of 85% and a Region goal of 90%, Barelas moved OSAT percentage from 81% to 92%. Barelas also moved In Stock percentage from 74% 85%.

**Remodel and Community Outreach**

- **STORE REMODELS**: Barelas completed full scale remodels for 2 stores (Store 1826 & 10090) between April 5 and May 9, 2020. Both remodels were highly complimented and completed early in her position as a District Manager despite no prior training or experience with remodels.

- **FOOD BANK DISTRIBUTION:** On May 21, 2020, Barelas district partnered with the North Texas Food Bank & the Army National Guard to distribute food to feed 300+ families. This event was hosted at Store 3896, Duncanville Texas. Barelas received recognition from corporate executive team, divisional team, and regional team for this event. On June 16, 2020, Barelas had a video shoot at store 1826, Duncanville Texas, to be able to share the event during the company 2020 Virtual Leadership Meeting, and Barelas

received a "Walk the Walk" recognition pin from Steve Sunderland (Executive Vice President-Store Operations).

- **BACK-TO-SCHOOL DRIVE:** On August 22, 2020, Barelas' district partnered with Dallas Police Department & Redbird Outreach Center to hold a "Back to School Drive" to support families unable to purchase supplies for their children. This event received recognition from Regional Director and was praised by the Director of Human Resources, Karla Unbehagen, who requested pictures to share in Division Recognition Newsletter.

10. The above numbers indicate that Barelas took a last place district within her region that was well below goal in many of the most important business areas and then promptly turned it around into a district that was surpassing company goals and was on the upswing. She did this while also seamlessly performing community outreach and redecoration projects that could have easily derailed her focus from core profitability. Despite this outstanding performance in both core and non-core areas, she was wrongfully terminated.

A. **Dollar General Repeatedly Demonstrated Disregard for Employment Laws and Sound Management Principles**

11. Dollar General as an entity seems to have had institutional problems with creating and enforcing a climate of appreciation for compliance with labor and employment laws. For just two examples, Dollar General recently paid a $6 million settlement with the EEOC related to allegations of racial discrimination (Dollar General to Pay $6 Million to Settle EEOC Class Race Discrimination Suit), and in 2014 paid an $8.3 Million class action claim for overtime wages ($8.3M General Dollar Unpaid Overtime Class Action Settlement Reached).

12. As for Barelas, her issues primarily flow from her direct supervisor, Regional Director Teddy Martyniuk. Martyniuk has a prior history of flaunting employment law compliance. Complaints against Martyniuk have occurred both during his time with Dollar General and at his prior employer, Wal-Mart. Indeed, during Barelas' time working for him at Dollar

General, Barelas was personally and repeatedly subjected to unlawful animus related to her protected classifications.

13. For example, on or about May 27, 2020, despite the fact Martyniuk knew Barelas is LGBTQ+ (as was the prior person responsible for this district), in discussing her predecessor, Martyniuk made a derogatory reference to her predecessor's LGBTQ+ status, only to remember that Barelas was LGBTQ+ herself. While he tried to retract the statement, the reality was clear and in the open. In subsequent communications with her predecessor, it is apparent that Martyniuk has a history of discriminating against LGBTQ+ people based on his personal animus.

14. On or about November 13, 2020, Barelas sought to hire an individual for a store in an area with a high concentration of Spanish speaking consumers. Accordingly, she discussed with Martyniuk making bilingual capabilities in Spanish and English a job requirement. In this discussion, Martyniuk stated that he was against such a job requirement because of his belief that it is hard to stay staffed with "the right candidate from that community" because they 'are not always the 'right fit.'"

15. As Dollar General should be well aware, it is unlawful under Title VII to discriminate against employees based on national origin/race and LGBTQ+ status. Further, race and national origin discrimination and retaliation is also protected under Section 1981 of the Civil Rights Act of 1871. Title VII has limits on punitive damages and administrative delays, but Section 1981 has neither.

16. Similarly, Martyniuk repeatedly and negatively dressed down Barelas for payment practices that ensured employees were properly paid. Even though he was aware of the numerous issues with Dollar general's payroll system, he told Barelas that she trusted what employees reported too much when correcting employees' pay whenever Dollar General's payment system

and/or a store manager had not properly recorded the employees' clocking in or clocking out. Despite such criticism, Barelas continued to ensure that payroll records were corrected when employees where not receiving pay for all hours they had worked.

17. Finally, despite protections for approved Family and Medical Leave, Barelas' supervisor consistently made references that were derogatory to individuals who could not work seven days a week without limit. In other words, it was clear to Barelas that any leave, whether protected by law or not, was a negative factor for analysis of an employee, and that any sickness or medical leave was considered a personal weakness. Indeed, even when Barelas was on approved leave for a family funeral, she was at all times required to answer her phone despite it often being unnecessary. This anti-leave animus is informative because Barelas was terminated while she was actually on FMLA approved leave.

### B.  Barelas Corrects Illegal Underpayment of Employees

18. Prior to her termination, Barelas discovered that some her subordinate employees were not being properly and legally paid the regular and/or overtime wages that they had worked. Specifically, she had discovered that one of the managers who worked for her was having his employees work off-the-clock. She also had discovered that systematic errors in the Dollar General recordkeeping system made it difficult for employees to clock in and clock out appropriately, and that these errors were systematically held against the employees involved and to the financial benefit of Dollar General. Indeed, Dollar General had a policy, practice, or procedure that made it difficult to correct employees' timesheets and to ensure that employees were lawfully paid.

19. Barelas, however, worked to ensure that her subordinate employees were properly and legally paid. She did so knowing that her conduct was unwanted by Dollar General and her

manager. When she did so, there was a series of communications that included oral communications and emails that notified Dollar General of the issues involved and stated that Barelas would not allow any persons working in her division to be illegally underpaid in violation of the FLSA.

**C.    Barelas Wrongfully Terminated While on FMLA Leave**

20.    Barelas was wrongfully terminated while on FMLA leave. On November 28, 2020, Barelas' brother died tragically. Just 12 days later on December 10, 2020, Barelas' father died of COVID. Although she was eligible for FMLA leave, it was not offered.

21.    Shortly thereafter, Barelas herself became sick with COVID. She received a doctor's note to be out of work from December 13, 2020 to December 25, 2020. Although she was eligible to take FMLA leave, the ability to take full leave was ignored, and she was treated like she was able to work from home, despite the fact that this was not part of her physician's note and not always a physical possibility when suffering from her particularly severe COVID symptoms.

22.    However, on December 16, 2020, Barelas was abruptly terminated without warning. She was first contacted at 3:23, and by 3:30 was on a Teams Meeting with Teddy Martyniuk, Erin Ann Oakes, & Karla Unbehagen. Mr. Martyniuk stated that effective that day, her employment with Dollar General would be terminated. Barelas was told that she was no longer allowed to drive the company car, and had 24 hours to drop the vehicle off, along with all Dollar General equipment. However, as Barelas was on COVID leave, Unbehagen told that they would look into another option.

23.    Barelas was told that she was terminated for excessive edits to timesheets and deducting time from associates costing the company an excessive amount of time to pay

associates back for time. This was false. These edits were required to correct the underpayment that Barelas had uncovered. Indeed, Barelas was terminated for openly paying employees for the regular and overtime they actually worked, which she had continued to do despite unlawful work rules that punished employees for the errors of the company's recordkeeping system and/or for failure to properly clock in and/or out.

24. The FLSA does not require employees to work for free or give up their right to be lawfully paid just because a company's recordkeeping system is error-prone or the demands of the job made it difficult to keep up with the ability to clock in or clock out. A manager cannot be fired for openly and vocally standing up for the rights of her subordinates to be paid legally and/or for properly paying subordinates regular and overtime according to the law when the company has a pattern, practice or policy of illegally denying pay for work actually performed and/or a pattern, practice, or policy of denying employees overtime pay for overtime work actually performed.

25. Either way, Barelas may show that her termination was wrongful under more than one federal law. Indeed, it is longstanding law that employers may terminate employees for more than one reason, and that more than one employment rights law could be violated by the same employment termination. Barelas pleads in the alternative that her termination violated the FLSA, the FMLA, and the ADA, and/or Title VII.

26. Indeed, her termination, while actively on FMLA qualifying COVID leave also violated the FMLA and/or the ADA based on leave animus and/or perceiving Barelas to be disabled because her COVID was a severe case. Instead of providing her proper FMLA leave, it wrongfully terminated her based on its anti-leave culture and animus, and/or because it perceived her as disabled.

## IV. LEGAL GROUNDS

### A. Plaintiff May Prove Multiple Illegal reasons for Her Termination

27. In this case, Plaintiff brings multiple claims for relief because her employer engages in the wholesale disregard of federal anti-discrimination and anti-retaliation employment law. None of the causes of action she asserts, however, requires her to prove only one causal reason for her termination, and each recognizes that a termination can have many reasons, some illegal and some legal.

28. For example, under the FLSA, the Eastern District of Texas currently uses the "but for" causation standard. *See, White v. Denton County*, Case No. 4:13cv13, 2014 WL 12637913, *7 (E.D. Tex. Feb. 28, 2014) (Bush, MJ), adopted by 2014 WL 12638077 (Mar. 28, 2014) (Schell, J.) That is, Plaintiff need not prove that the illegal motivation was the only reason for the termination, because "[o]ften events have multiple causes." *See Bostock v. Clayton County, Georgia*, 590 U.S. ___, 140 S.Ct. 1731, 1739-40, 207 L.Ed. 218 (2020) (a Title VII case holding that "because of" language in Title VII creates a "but for" causation test); s*ee also, Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 580 (5th Cir. 2004) (holding that "but for" causation applies to FLSA retaliation cases).

29. As the Supreme Court clarified, "In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id.* at 1739.

### B. Cat's Paw Doctrine

30. Cat's Paw theory transfers the discriminatory animus of a co-worker or supervisor to a terminated employee's employer, even if they termination decision may have been made by

**PLAINTIFF GUADALUPE BARELAS' ORIGINAL COMPLAINT - PAGE 9**

another employee acting on information provided by the co-worker. Although Cat's Paw theory started in Title VII cases, it is also applied to FMLA and FLSA cases. *See, e.g., Zamora v. City Of Houston*, 798 F.3d 326, 331-32 (5th Cir. 2015) (Title VII cases); *Shepherd v. Goodwill Indus. South Texas, Inc*, 872 F.Supp 2d 569, 580-81 (S.D. Tex. 2011) (ADA); *Coleman v. FFE Transp. Services, Inc.*, Case No. 3:12–CV–1697–B.2013 WL 1914932 (N.D. Tex. May 9, 2013) (FMLA); and *Schaeffer v. Warren County, Mississippi*, Case No. 3:14cv945, 2017 WL 4765074, ** 5-6 (S.D. Miss. June 1, 2017) (FLSA).

31. To assert a valid Cat's Paw theory, "a plaintiff must establish two conditions: (1) that a co-worker exhibited retaliatory animus and (2) that the same co-worker possessed leverage, or exerted influence, over the titular decisionmaker." *Evans v. Tex. DOT,* 547 F.Supp.2d 626, 656 (E.D. Tex. 2007) (citing *Roberson v. Alltel Info. Servs.,* 373 F.3d 647, 653 (5th Cir.2004)).

32. "When the person conducting the final review serves as the 'cat's paw' of those who were acting from retaliatory motives, the causal link between the protected activity and adverse employment action remains intact." *Gee v. Principi,* 289 F.3d 342, 346 (5th Cir.2002).

33. However, the Cat's Paw need not be the final decisionmaker. Indeed, under the Cat's Paw analysis, "the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision ... so long as the individual shown to have the impermissible bias played a meaningful role" in the employment action. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999).

34. The Fifth Circuit holds that when a supervisor or manager takes actions motivated by retaliatory animus that are intended to cause an adverse employment action and do cause that action, this conduct is sufficient to allow the conclusion that the employment decision, even if made by a different actor, is tainted by the same illegal bias or motive. *Zamora*, 798 F.3d at 332

(holding evidence of supervisor's animus was sufficient to show other defendant's actor's ultimate decision was illegal).

35. Accordingly, even when an otherwise independent investigation occurs, an employer may not rely on a so-called "independent" investigation if the investigation of it is tainted by the improper discriminatory or retaliatory animus of employees involved in the investigation:

> Cat's paw liability attaches when the biased intermediate employee's actions are "a causal factor of the ultimate employment action." [*Staub v. Proctor Hosp.*, 562 U.S. 411, 422, 131 S.Ct. 1186, 1193, 179 L.Ed. 144 (2011)]. The intermediate employee's actions need not be the sole cause of the adverse action; "[t]he decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes." *Id.* at 1192 (citations omitted) (emphasis in original).
>
> An employer will not be liable for its intermediate employee's discrimination if "the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action." *Id.* at 1193. However, if the adverse employment action is related to the discriminatory action, the employer may be liable. Neither independent investigation nor independent judgment on the part of the employer provides a per se defense. For example, if the intermediate supervisor makes a biased report to the ultimate decisionmaker, it may be a causal factor in the adverse action if the independent investigation by the employer "takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.* Also, if "the independent investigation relies on facts provided by the biased supervisor," *id.* then the investigation was not, in actuality, independent and the employer is liable.
>
> See *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 (6th Cir. 2012).

36. Similarly, the Fifth Circuit has fully developed and adopted Cat's Paw theory in federal employment discrimination and retaliation claims:

> [A] ... retaliation plaintiff is entitled to use the cat's paw theory of liability if he can demonstrate that a person with a retaliatory motive "used the decisionmaker to bring about the intended retaliatory action." [*Zamora v. City of Hous.*, 798 F.3d 326, 331 (5th Cir. 2015).] We explained that such a plaintiff must produce sufficient evidence that "(1) his ... supervisors, motivated by retaliatory animus, took acts intended to cause an adverse employment action; and (2) those acts

> were a but-for cause of his termination." *Id.* at 333. Discussing the second prong, we noted that "an investigation that 'resulted in an adverse action for reasons unrelated to the ... supervisors' retaliatory statements" could be a superseding cause, breaking the causal chain. *Id.* at 334 (alterations in original) (quoting *Staub*, 562 U.S. at 421, 131 S.Ct. 1186). However, we emphasized that "if an independent investigation 'takes a supervisor's biased report into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified,' the supervisor's action 'may remain a causal factor.' " *Id.* at 334–35 (alterations in original) (quoting *Staub*, 562 U.S. at 421, 131 S.Ct. 1186).

*Schaeffer,* 2017 WL 4765074, ** 5-6 (upholding FLSA jury verdict based on Cat's Paw), citing *Fisher v. Lufkin Industries, Inc.*, 847 F.3d 752, 758 (5th Cir. 2017), as revised (Mar. 30, 2017) (internal brackets omitted).

37. In this case, in addition to direct liability, Plaintiff asserts that the Cat's Paw Doctrine applies to Defendant DGC through its Regional Director Teddy Martyniuk who had shown anti-classification bias against persons who take FMLA leave, persons who were gay, persons who have been sick, and persons who stood up for employee rights.

**C.     The Fair Labor Standards Act**

38. The Fair Labor Standards Act makes it "unlawful for any person to discharge or in any other manner discriminate against any employee because such employee has filed any complaint" related to the Act. 29 U.S.C. § 215(a)(3).

39. The elements of a retaliation claim under the FLSA require, at a minimum, a showing that (1) the plaintiff engaged in a statutorily protected activity, and (2) his employer thereafter subjected him to an adverse employment action (3) as a reprisal for having engaged in protected activity. *Blackie v. Maine,* 75 F.3d 716, 722 (1st Cir.1996). The central issue on appeal is whether Claudio engaged in a statutorily protected activity that triggers the protection of 29 U.S.C. § 215(a)(3).

40. In cases where a manager is taking action on behalf of her subordinates, the Fifth Circuit has opined the requirements to state a claim in an unpublished opinion:

**PLAINTIFF GUADALUPE BARELAS' ORIGINAL COMPLAINT - PAGE 12**

> For a manager to assert a claim of retaliation, she must show that she took actions to "step outside his or her role of representing the company and either [1] file (or threaten to file) an action adverse to the employer, [2] actively assist other employees in asserting FLSA rights, or [3] otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA."
>
> *Hagan v. Echostar Satellite, L.L.C.*, 529 f.3d. 617, 627 (5th Cir. Feb. 16, 2007) (Emphasis added—citations omitted).

41. The Fifth Circuit, however, in the *Hagan* matter agreed with prior district courts and courts of appeals that found even informal complaints to a company may constitute protected activity under Section 215(a)(3). *See id. citing, inter alia, Dearmon v. Tex. Migrant Council, Inc.*, 252 F.Supp.2d 367, 367-68 (S.D.Tex. 2003) (Kazen, J.); *Truex v. Hearst Commc'ns, Inc.*, 96 F.Supp.2d 652, 665-66 (S.D.Tex. 2000) (Rosenthal, J.); *see also, e.g., Lambert v. Ackerley*, 180 F.3d 997, 1003-05 (9th Cir. 1999) (en banc); *Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35, 44-45 (1st Cir. 1999); *EEOC v. Romeo Comty. Schs.*, 976 F.2d 985, 989-90 (6th Cir. 1992); *EEOC v. White Son Enters.*, 881 F.2d 1006, 1011 (11th Cir. 1989); *Brock v. Richardson*, 812 F.2d 121, 124-25 (3d Cir. 1987); *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 387 (10th Cir. 1984); *Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179, 181 (8th Cir. 1975).

42. In the Hagan case, the employee/manager never stepped outside of his role as manager to act trigger FLSA protection. *See id.* But in this case, Barelas did so, including by act to informing Defendant that she would not violate the FLSA rights of her subordinate employees and would pay all wages actually owed and would not engage in falsely denying wages that had been earned under the FLSA, and by thereafter ensuring that she had properly paid all of her subordinate employees their proper FLSA regular and overtime wage despite knowing her actions would be perceived as disloyal.

43. Indeed, when a manager stands up for the overtime wages of his or her subordinates, such conduct is protected by the FLSA anti-retaliation provision. See, id. at ___,

citing, *York v. City of Wichita Falls, Tex.*, 944 F.2d 236 (5th Cir. 1991) (fire department battalion chief and union representative found to have made an FLSA complaint by asking if his subordinates had earned overtime wages). The key question was whether Barelas was advocating for the rights of her subordinates. *See, id.*

44. Regarding damages, the FLSA states in relevant part:

**(b) Damages; right of action; attorney's fees and costs; termination of right of action**

… Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, <u>including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages</u>.
…
An action to recover the liability prescribed in the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction
…
The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.

29 U.S.C. § 216 (b) (emphasis added).

45. A retaliation victim may also recover emotional distress damages under the FLSA. *Pineda v. JTCH Apartments, L.L.C.*, 843 F.3d 1062 (5th Cir. 2016).

46. Under FLSA case law, reinstatement and front pay are both equitable remedies. *Bogan v. MTD Consumer Group, Inc.*, 919 F.3d 332, 335 (5th Cir. 2019). Although reinstatement is the preferable remedy, should the Court find in its equitable powers that reinstatement would be unfeasible, then the Court should award equitable front pay as an alternative to reinstatement. *Id.* at 335-39.

**D.** <u>**The Family and Medical Leave Act**</u>

47. Regarding her FMLA claim, a recent December 14, 2020, order obtained by

Kilgore & Kilgore from U.S. District Judge Mazzant in in the Eastern District of Texas, highlights how a plaintiff proves a retaliatory discharge case similar like this one:

> To succeed on a claim for FMLA retaliation, an employee must show that "1) [s]he was protected under the FMLA; 2) [s]he suffered an adverse employment action; and 3) ... the adverse decision was made because [s]he sought protection under the FMLA." *Perkins v. Child Care Assocs.,* 751 F. App'x 469, 473 (5th Cir. 2018) (per curiam) (ellipsis and internal quotation marks omitted) (quoting *Acker v. Gen. Motors, L.L.C.,* 853 F.3d 784, 790 (5th Cir. 2017)). In FMLA cases, the Fifth Circuit has also clarified that the third element requires a showing that "there is a causal link between the protected activity and the discharge." *Richardson v. Medtronics Intern., Inc.*, 434 F.3d 327, 332 (5th Cir. 2005).
>
> "When there is no direct evidence of discriminatory intent, we have typically relied on the familiar *McDonnell–Douglas* burden shifting framework to determine whether an employer discharged an employee in retaliation for participating in FMLA-protected activities." *Id.* If Meade establishes a *prima facie* case of retaliation, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for terminating her. *Id*. If Defendant succeeds in doing so, "the burden shifts back to the employee to show by a preponderance of the evidence that the employer's articulated reason is a pretext for discrimination." *Id.* at 332–33.
>
> The parties do not dispute that Meade made a request for FMLA leave or that she suffered an adverse employment action when she was terminated. The only issue regarding the *prima facie* case is causation. Meade has established a *prima facie* case of retaliation. She provided sufficient evidence to establish a causal link. "When evaluating whether the adverse employment action was causally related to the FMLA protection, the court shall consider the 'temporal proximity' between the FMLA leave, and the termination." *Mauder v. Metro. Transit Auth. Of Harris Cty.*, 446 F.3d at 583 (5th Cir. 2006) (citing *Wilson v. Lemington Home for the Aged,* 159 F. Supp. 2d 186, 195–96 (W.D. Pa. 2001) (explaining that a causal connection existed between the FMLA leave and the termination when the plaintiff was terminated while on FMLA leave and reasoning that the close proximity in time between FMLA leave and the adverse action establishes the necessary causal connection)).
>
> The Supreme Court has acknowledged that when the temporal proximity is "very close," proximity alone suffices to establish causation in a *prima facie* case of retaliation. *Clark Cnty. Sch. Dist. V. Breeden*, 532 U.S. 268, 273 (2001). In this case, the adverse employment action happened within nine days

of Meade's request for FMLA paperwork. Such short temporal proximity is sufficient to establish a causal link for the purpose of establishing her *prima facie* case.

*Meade v. Ingraham Micro, Inc.*, Case no. 4:19-CV-00304, 2020 WL 7364605 (Dec. 14, 2020).

48. Under the FMLA, damages include pay and benefits, and "other compensation" denied or lost by reason of the violation, 29 U.S. Code § 2617 (a)(i)(I). Additionally, unless the court finds that the employer acted in good faith, the employee also receives liquidated damages, which essential doubles her recovery under subsection (A)(i)(I). See Id. at § 2617 (a)(i)(II). The FMLA also allows "for such equitable relief as may be appropriate, including employment, reinstatement, and promotion." Id. at 2617 (a)(i)(B). Although reinstatement is the preferred equitable remedy, this statutory provision has been interpreted to include the equitable remedy of front pay if reinstatement in not feasible. *See, Downey v. Strain*, 510 F.3d 534, 544 (5th Cir. 2007) and *Giles v. Gen. Elec. Co.,* 245 F.3d 474, 489 (5th Cir.2001).

E. <u>THE AMERICANS WITH DISABILITIES ACT</u>

49. The ADA prohibits a covered entity from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

50. Under the ADA, a "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12112(a); § 12111(8); *Daugherty v. City of El Paso,* 56 F.3d 695, 696 (5th Cir.1995), cert. denied, 516 U.S. 1172, 116 S.Ct. 1263, 134 L.Ed.2d 211 (1996).

51. An individual with COVID is perceived to have a disability if the employer takes action based on misperceptions of inability to work related to their COVID diagnosis.

52. In this case, Defendant terminated Plaintiff while she was actively suffering from diagnosed COVID, and upon information and belief, Defendant acted based on its misperceptions of Plaintiff's limitations due to her COVID diagnosis and the severity of her COVID symptoms.

F. **TITLE VII – GENDER AND SEXUAL ORIENTATION**

53. Title VII makes it unlawful for an employee to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a).

54. Under Title VII, to meet her prima facia burden, Plaintiff must prove: (1) she is a member of a protected class, (2) she was qualified to do the job, (3) she suffered an adverse employment action, and (4) others outside the protected group (non-Blacks) were treated more favorably than she was. *Id.* (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

55. In this case, Plaintiff is a female homosexual, and her supervisor, who was responsible for initiating and controlling her termination was openly hostile to both female and gay employees. He allowed his bias to control his decision to wrongfully terminate Plaintiff based on a false pretext.

V. **CLAIMS FOR RELIEF**

Plaintiff brings the following claims for relief, asserting she was wrongfully terminated in violation of one or more of the following grounds:

## FIRST CLAIM FOR RELIEF

### (WRONGFUL TERMINATION UNDER THE FLSA)

56. Plaintiff realleges each allegation set forth in the paragraphs above.

57. Defendant wrongfully terminated Barelas in unlawful retaliation for correcting employees time sheets to ensure that the employees were paid in full under the FLSA, just has she had previously stated she would do to ensure the FLSA rights of her subordinate employees.

58. By reason of the foregoing, Defendant proximately caused actual damages to Plaintiff Barelas by wrongfully terminating her employment.

59. Barelas has been injured by her wrongful damages and as a result should receive compensatory legal damages and equitable remedies, including but not limited to: back equitable reinstatement, if feasible, or front pay; mental anguish; loss of enjoyment life; the loss of benefits in the past and in the future; punitive damages; necessary and other compensatory damages or equitable relief that the Court finds just and/or right.

## SECOND CLAIM FOR RELIEF
### (WRONGFUL TERMINATION UNDER THE FMLA)

60. Plaintiff realleges each allegation set forth in the paragraphs above.

61. Defendant wrongfully terminated Barelas in unlawful retaliation for seeking her FMLA leave rights.

62. Defendant's stated reason for Barelas' termination is a false pretext for retaliation.

63. By reason of the foregoing, Defendant proximately caused actual damages to Plaintiff Barelas by wrongfully terminating her employment.

64. Barelas has been injured by her wrongful damages and as a result should receive compensatory legal damages and equitable remedies, including but not limited to: back equitable reinstatement, if feasible, or front pay; mental anguish; loss of enjoyment life; the loss of benefits

in the past and in the future; punitive damages; necessary and other compensatory damages or equitable relief that the Court finds just and/or right.

### THIRD CLAIM FOR RELIEF
### (WRONGFUL TERMINATION UNDER TITLE VII)

65. Plaintiff realleges each allegation set forth in the paragraphs above.

66. Defendant wrongfully terminated Barelas in unlawful retaliation for opposing conduct made illegal by Title VII and because she was Hispanic and/or homosexual.

67. Defendant's stated reason for Barelas' termination is a false pretext for retaliation.

68. By reason of the foregoing, Defendant proximately caused actual damages to Plaintiff Barelas by wrongfully terminating her employment.

69. Barelas has been injured by her wrongful damages and as a result should receive compensatory legal damages and equitable remedies, including but not limited to: back equitable reinstatement, if feasible, or front pay; mental anguish; loss of enjoyment life; the loss of benefits in the past and in the future; punitive damages; necessary and other compensatory damages or equitable relief that the Court finds just and/or right.

### JURY DEMAND

70. Although the Plaintiff seeks an equitable injunction of reinstatement or equitable front pay in the alternative, even cases with remedies sounding in equity, to the extent there are one or more issues of fact or law suitable for a jury, the Plaintiff respectfully requests a jury trial on all such issues.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Guadalupe Barelas seeks relief against Defendant Dollar General Corporation, as follows:

A. That this matter be submitted to a trial by jury on all legal issues and as a bench trial for all issues of equity, and that Judgment be entered against all Defendants

   a. finding that the Defendant s wrongfully terminated her employment in retaliation for activities protected by the FLSA, the FMLA, the ADA, and/or Title VII;

   b. Awarding Plaintiff compensatory damages and equitable relief, including back pay; equitable reinstatement or equitable front pay; loss benefits in the past and in the future; mental anguish and loss of enjoyment of life; punitive damages and/or liquidated damages, and any and all other legal damages or equitable relief that the Court finds just and right.;

   c. Award Plaintiff attorney fees;

   d. As to All Claims for Relief, that Plaintiff be awarded costs of court, and all such other and further relief in law or equity as the Court deems to be just and right.

RESPECTFULLY SUBMITTED,

/s/ Eric N. Roberson

_____
Eric Roberson
Texas State Bar No. 00792803
Kilgore & Kilgore, PLLC
3141 Hood Street, Suite 500
Dallas, TX 75219
214-379-0817 Direct
214.969.9099
214.379.0843 Fax
ENR@KilgoreLaw.com